

FILED
2021 Nov-17  PM 03:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **BRANDI GHOLSTON, as guardian and next friend of M.G., a minor,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **Civil Action No. 3:20-CV-00013-CLS** |
| **FRANKLIN COUNTY BOARD OF EDUCATION, *et al*.,** | ) ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDERS

Brandi Gholston commenced this action on behalf of her minor son, Malachi, who is generally identified in the pleadings by the initials "M.G." the Franklin County, Alabama, Board of Education for race discrimination under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*.  Her complaint also alleged claims under 42 U.S.C. § 1983 against:  Greg Hamilton, Superintendent of the Franklin County School System; Gary Odom, Principal of the high school located in Phil Campbell, Alabama;[1] and, Darit Riddle, Assistant Principal of the same school.

---

[1] Phil Campbell is a small town located in the southeastern portion of Franklin County, Alabama.  Its population according to the 2020 Census was 992 persons.  *See*, *e.g.*, https://en. wikipedia.org/wiki/Phil_Campbell,_Alabama (last visited Nov. 11, 2021).

When responding to defendants' motions for summary judgment,[2] however, plaintiff conceded that all of her claims — except for her Title VI claim against the Franklin County Board of Education, and, her Section 1983 claim against Darit Riddle — were due to be dismissed, "including any separate claim relating to disparate treatment, and all claims against [defendants Greg] Hamilton and [Gary] Odom."  Doc. no. 44 (Plaintiff's Consolidated Response to Defendants' Motions for Summary Judgment), at ECF 6 (alterations supplied).[3]

## I.  FACTS

The events forming the basis of plaintiff's claims occurred in the Phil Campbell High School during the 2017 and 2018 academic years. Plaintiff's minor son then was a student in the seventh and eighth grades.[4]  Assistant Principal Darit Riddle was responsible for disciplinary issues, but he was not the sole disciplinarian; rather, he also relied upon teachers, coaches, and other personnel to take appropriate action for disciplinary infractions.[5]

---

[2] Doc. nos. 36 (motion of defendants Greg Hamilton, Gary Odom, and Darit Riddle) and 37 (motion of Franklin County Board of Education).

[3] "ECF" is an acronym formed from the initial letters of the "Electronic Case Filing" system that allows parties to file and serve documents electronically.  *See The Bluebook, A Uniform System of Citation,*, Rule 7.1.4, at 21 (Columbia Law Review Ass'n *et al.* eds., 19th ed. 2010).  When this court cites to pagination generated by the ECF header, it will, as here, precede the page number(s) with the letters "ECF."

[4] Phil Campbell High School then housed students enrolled in grades seven through twelve. Doc. no. 38-29 (Darit Riddle Affidavit) ¶ 4.

[5] *Id*. ¶ 11.

Plaintiff, Brandi Gholston, was a counselor (and later an English teacher) at Phil Campbell High School during those academic years.[6] Her father (and, therefore, M.G.'s maternal grandfather), Gary Williams, had been Superintendent of the Franklin County School System from 2009 until his retirement in 2016.[7]

Brandi Gholston is White (Caucasian), and Jay Gholston, M.G.'s father, is African-American. During the academic years at issue, the student body of Phil Campbell High School was predominately white.[8] Only six to eight of its 436 students were African-American or, like M.G., of biracial heritage.[9] Plaintiff complained of several incidents that she believed to be racial harassment of her son during his enrollment in the school.

## A.    The Student Code of Conduct

Students of Phil Campbell High School are subject to a "Code of Conduct" containing a section entitled "Student Harassment/Bullying Prevention." Relevant portions read as follows:

> I.    No student shall be engaged in or be subjected to harassment, violence, threats of violence, or intimidation by any other student that is based on any of the specified characteristics that have been

---

[6] *Id.* ¶ 29; doc. no. 38-1 (Brandi Gholston Deposition), at 7-8.

[7] Doc. no. 38-1 (Brandi Gholston Deposition), at 95-98; doc. no. 38-29 (Darit Riddle Affidavit) ¶ 7.

[8] Doc. no. 38-22 (Darit Riddle Deposition), at 34-35.

[9] *Id.* at 34.

3

identified by the Franklin County Board of Education in this policy. Students who violate this policy are subject to disciplinary sanctions.

. . . .

III.   Description of Behavior Expected by Children

A.   Students are expected to treat other students with the courtesy, respect and dignity and comply with the rules governing student behavior [*sic*]. Students are expected and required (1) to comply with the requirements of law, policy, regulation, and rules prohibiting harassment, violence or intimidation; (2) to refrain from inflicting or threatening to inflict violence, injury, or damage to the person or property of another student; and (3) to refrain from placing another student in fear of being subjected to violence, injury, or damage when such actions or threats are reasonably perceived as being motivated by any personal characteristic of the student that is identified in this policy.

B.   Threats of violence, harassment, and intimidation are prohibited and will be subject to disciplinary consequences and sanctions if the perpetrator of such action is found to have based the prohibited action on one or more of the following personal characteristics of the victim of such conduct:

- The student's race;
- The student's sex;
- The student's religion;
- The student's national origin; or
- The student's disability[.]

IV.   A series of graduated consequences for any violation of this policy will be those outlined in the rules governing student

behavior or any rule or standard in the rules under authority of this policy.

Doc. no. 38-29 (Darit Riddle Affidavit), Exhibit C (alteration supplied). The "Student Harassment/Bullying Prevention" section also outlines a procedure for registering written complaints, but adds that, "[a]t the request of the complaining student or the student's parent or legal guardian, incidental or minor violations may be presented and resolved informally."[10]

## B. M.G.'s School Record

M.G. is an excellent student who earned stellar grades and won many awards.[11] As a seventh-grader, he was identified as an exceptional student by Duke University's Talent Identification Program.[12] He was a skillful basketball player, as demonstrated by the fact that he was a member of the ninth grade team while still in the seventh grade.[13] His attendance was nearly perfect,[14] and only two disciplinary infractions were noted in his school records — one for a lunchroom fight; and another for damaging a piece of computer equipment.[15]

---

[10] *Id.*, Exhibit C.

[11] Doc. no. 38-1 (Brandi Gholston Deposition), at 65; doc. no. 38-29 (Darit Riddle Affidavit) ¶ 26.

[12] Doc. no. 38-29 (Darit Riddle Affidavit), Exhibit D.

[13] Doc. no. 38-22 (Darit Riddle Deposition), at 155.

[14] Doc. no. 38-29 (Darit Riddle Affidavit) ¶ 27.

[15] Doc. no. 38-22 (Darit Riddle Deposition), at 220, 215.

## C.    Mr. Stacy's Music Class

M.G. was a student in Mr. Stacy's music class during the seventh grade.[16]  A male student called him the "N-word" during class.[17]  M.G. reported the incident to Assistant Principal Darit Riddle,[18] who took no disciplinary action.[19]  There is no evidence that M.G. reported the slur to his music teacher.[20]

## D.    The "42" Movie

During March of 2018, M.G. was a student in Tina King's "enrichment class," which included "average to above-average students."[21]  Ms. King occasionally supplemented the curriculum with movies.[22]  During one such occasion, she showed a portion of the 2013 movie entitled "42," which depicted events leading to Jackie Robinson's selection as the first African-American to integrate Major League baseball.[23]  The film dialogue included racist slurs, and visually depicted discriminatory incidents as Robinson was forced to withstand the trial by fire posed

---

[16] Doc. no. 38-2 (M.G. Deposition), at 23-25.

[17] *Id.*

[18] Id. at 24-25.

[19] *Id.*

[20] During his deposition, M.G. could not recall the name of the student who uttered the racial epithet.  Further, the student did not continue to use that racially-derogatory term, but seemed instead to have "corrected himself."  *Id.* at 25-26.

[21] Doc. no. 38-33 (Tina King Affidavit) ¶ 7.

[22] *Id.* ¶ 8.

[23] *Id.* ¶ 9.

by teammates who did not want to play with him, and a society that often would not allow him to travel, eat, or lodge with the rest of the team, because of his race.[24]  M.G. testified that he was the only student of color in the class, and that some of the white students looked at him and laughed during those scenes.[25]  M.G. spoke to his mother about that incident,[26] and she related her concern about the content of the movie and the students' reaction to Darit Riddle.[27]  He and Principal Gary Odom asked Ms. King to cease showing the movie (she complied),[28] but no students were disciplined by either Odum or Riddle.  Ms. King recalled that when some of her students had "snickered — at the content of the movie, not [M.G.]," she paused the film and "corrected the behavior."[29]

## E.    The "Alabama 'N-Word' Song"

During M.G.'s seventh-grade year, while he was a member of the ninth-grade basketball team, some of his teammates sang in the locker room a song that is referred to in the record as the "Alabama 'N-word' song."  The words of that song were not

---

[24] *See*, *e.g.*, https://www.hollywoodreporter.com/movies/movie-reviews/42-film-review-434880/amp/; and https://en.m.wikipedia.org/wiki/42_(film) (both last visited Nov. 14, 2021).

[25] Doc. no. 38-2 (M.G. Deposition), at 86-87.

[26] *Id.* at 89-90.

[27] Doc. no. 38-1 (Brandi Gholston Deposition), at 62-63; doc. no. 38-29 (Darit Riddle Affidavit) ¶ 25.

[28] Doc. no. 38-29 (Darit Riddle Affidavit) ¶ 25; doc. no. 38-33 (Tina King Affidavit)  ¶ 15.

[29] Doc. no.  38-33 (Tina King Affidavit) ¶ 14.

disclosed to this court, and plaintiff said only that the lyrics included "derogatory, racially slamming terminology made to intimidate" her son.[30]

M.G. told his mother about the incident and she, in turn, reported the conduct to Darit Riddle,[31] who took no corrective action.[32]  Griffin Harris, the basketball coach, testified that when plaintiff told him about the incident, he confronted the members of the team, but they denied playing or singing the song.[33]

That same season, M.G.'s team participated in the finals of the county basketball tournament.  Following the game, M.G. told his father, Jay Gholston, that one of the players, Boone Swinney, had directed racist remarks toward him.[34]  Mr. Gholston related that information to Melinda Swinney, Boone's mother, and both she and Mr. Gholston spoke to M.G. and Boone.  Boone denied making racist remarks, but admitted that he had played a recording of the "Alabama 'N-word' song" on his cell telephone for another student to hear.[35]  Ms. Swinney "chewed him out," and Mr.

---

[30] Doc. no. 38-1 (Brandi Gholston Deposition), at 55-56.  If the lyrics of that song were even remotely similar to those sung by an American songwriter and musician who sometimes used the stage name of "Johnny Rebel" (*i.e.*, Clifford Joseph Trahan), and who performed songs supportive of white supremacy — the adjective "despicable" would not be adequate to describe their deplorable nature.   *See*   https://en.wikipedia.org/wiki/Johnny_Rebel_(singer);   and   https://www.paroles-musique.com/eng/Johnny-Rebel-Alabama-Nigger-lyrics,p1027551 (both last visited Nov. 14, 2021).

[31] Doc. no. 44-2 (Brandi Gholston Declaration) ¶ 7.

[32] *Id.*  Mr. Riddle testified that he did not learn about the song until after the final basketball tournament.  Doc. no. 38-22 (Darit Riddle Deposition), at 81.

[33] Doc. no. 38-20 (Griffin Harris Deposition), at 9.

[34] Doc. no. 38-2 (M.G. Deposition), at 42.

[35] *Id.* at 43.

Gholston confronted the team members about the use of racist language.[36]  Ms.

Swinney also confronted the white players in the bleachers, outside the locker room.[37]

(The father of one basketball team member later accused Mr. Gholston of threatening

the team.[38])

Following that incident, Darit Riddle, who did not attend the basketball game,

collected statements from several persons in attendance,[39] but no team members were

disciplined.[40]

**F.    Sage Raper Altercation**

M.G. had an altercation with a fellow student at the end of a seventh-grade

physical education class,[41] which he described as follows:

A.    I remember one situation being at the end of P.E.  The bell had
rung and we were — we always played like two minutes after the
bell had rung.  We always continue[d] our basketball game for
about two minutes.

. . . .

A.    And like there was a kid [Sage Raper] that drove in for a layup
and the score was close, I didn't want him to make it.  So like I
kind of — I fouled him, but it wasn't like just, you know, just a

_____

[36] *Id.* at 42-43; doc. no. 38-3 (Jay Gholston Deposition), at 26.

[37] Doc. no. 38-2 (M.G. Deposition), at 43.

[38] *Id*. at 46; doc. no. 38-3 (Jay Gholston Deposition), at  30.

[39] *See* doc. no. 38-12, at ECF 2-8.

[40] Doc. no. 38-22 (Darit Riddle Deposition), at 90-91.

[41] Doc. no. 38-2 (M.G. Deposition), at 52.

brutal foul.  It was just a foul to make sure he didn't make it.  And he got mad.  And it's just like he took both his hands and he just like shoved my face in almost and I didn't retaliate.  I just walked away because that was what I was told to do.

Q.    Well, did you think there was — did that incident — did anything about that incident suggest to you that it was racially motivated?

A.    Yes.

Q.    What – tell us why you thought that.

A.    Whenever he went to push me he was calling me racial names like you cotton picking "N word," you better watch your fouling, you know, things.

Doc. no. 38-2 (M.G. Deposition), at 50-51 (alteration supplied).

M.G. reported the incident to Darit Riddle, who questioned Raper,[42] and later viewed a gym surveillance video with M.G. and his mother.[43]  Riddle said that he would handle the situation,[44] and imposed one day of in-school suspension on Sage Raper, but no mention of racial slurs was included in Raper's records.[45]  Instead, the day of in-school suspension was recorded in the school system's electronic database as simply a sanction for "fighting," with the annotation "pushed another student in the

---

[42] Doc. no. 38-29 (Darit Riddle Affidavit) ¶ 18(b).

[43] Doc. no. 38-2 (M.G. Deposition), at 53. The video did not record audio.  *Id.* at 54.

[44] *Id*. at 53.

[45] Riddle filed an affidavit stating that he did not recall M.G. "making any mention of racial slurs when he reported the incident to me."  Doc. no. 38-29 (Darit Riddle Affidavit), ¶ 18(b).

gym."[46]

## G.    Seventh-Grade Awards Day

M.G. received several awards for academic achievements during the awards ceremony held at the end of his seventh-grade, 2017-18 school year.[47]  When he walked to the front of the auditorium to receive one of the awards, another student placed chewing-gum on the seat of M.G.'s chair, which stuck to his pants when he returned to his seat.[48]  M.G. complained to his mother, who reported the incident to Darit Riddle.[49]  Ms. Gholston suspected Hunter Bishop of being the student who had placed the gum on M.G.'s seat, because Bishop had said "you're still a stupid N-word" each time M.G. returned to his seat after receiving an award.[50]  Riddle interviewed Bishop and, even though there was no proof that he was the culprit, Riddle levied a one-day, out-of-school suspension.[51]

## H.    Braxton Lawrence's Harassment

M.G. testified that another student, Braxton Lawrence, regularly directed racial

---

[46] Doc. no. 38-13, at ECF 7.

[47] Doc. no. 38-2 (M.G. Deposition), at 101.

[48] *Id.* at 101-02.

[49] Doc. no. 38-29 (Darit Riddle Affidavit) ¶ 18(e).

[50] Doc. no. 38-1 (Brandi Gholston Deposition), at 76.  Note that when M.G. was questioned about the gum incident during his deposition, and asked whether "anything else happen[ed] on that occasion of a racial nature," he replied:  "Not that I remember."  Doc. no. 38-2 (M.G. Deposition), at 101-03.

[51] Doc. no. 38-29 (Darit Riddle Affidavit) ¶ 18(e).

slurs at him during the eighth grade.[52]  He described their interaction as follows:

> Q.     What were those incidents?
>
> A.     For one, I remember there were a couple of days where I would
> be like walking from one class to another, specifically 1st and 2nd
> period.
>
> There was one student [Braxton Lawrence] that would always
> walk by me in this particular spot and he always had something
> to say.
>
> On a couple — on most of those occasions he would call me an "A"
> wipe like —
>
> Q.     An "A" wipe?
>
> A.     An "A" wipe.
>
> And others he would say the "N word."  It was always something
> referring to skin color.
>
> He — he — one day he even called me just simply [the] "S" word.
> Just pointing at me saying, ["H]ey, there's walking shit.["]

Doc. no. 38-2 (M.G. Deposition), at 127 (alterations supplied).

M.G. did not recall during his deposition whether he had reported any of those

incidents to school personnel,[53] but he later submitted a declaration stating:  "On

multiple occasions my mother and I reported to Mr. Riddle that Braxton Lawrence

---

[52] Doc. no. 38-2 (M.G. Deposition), at 127-28.

[53] *Id.* at 128.

was harassing me by calling me names that referenced my skin color."[54]

Plaintiff confirmed that she reported these incidents to Darit Riddle, but she did not know whether Lawrence had been disciplined.[55]

Riddle testified that he believed Lawrence may have directed racial slurs at M.G.,[56] but nothing in the record indicates that Lawrence was disciplined for his offensive comments.

## I.    Clayton DeMartin

M.G. testified that another student, Clayton DeMartin, "jumped" him in the hallway at the end of a school day.[57]  While DeMartin was "hitting [M.G.] in the head, he was saying F'ing 'N word,' you're going to watch what you say to me."[58]  Other students assisted M.G., and separated the two.[59]  M.G. immediately reported the incident to Mr. Riddle,[60] who spoke to DeMartin and M.G., both of whom acknowledged "having exchanged disparaging words."[61]  Even so, Riddle did not recall that M.G. had reported racial slurs being uttered by DeMartin during the

---

[54] Doc. no. 44-3 (M.G. Declaration) ¶ 3.

[55] Doc. no. 38-1 (Brandi Gholston Deposition), at 91; doc. no. 44-2 (Brandi Gholston Declaration) ¶ 8.

[56] Doc. no. 38-22 (Darit Riddle Deposition), at 41-42.

[57] Doc. no. 38-2 (M.G. Deposition), at 56-57.

[58] *Id.* at 58.

[59] *Id.* at 59.

[60] *Id.*

[61] Doc. no. 38-29 (Darit Riddle Affidavit) ¶ 18(d).

incident.[62]  The corresponding electronic entry, recorded by Riddle on February 15, 2018, characterized the altercation as "other incident," and noted that DeMartin received a two-day, in-school suspension for "hitting another student."[63]

## J.    Rhett Jackson

As M.G. was leaving a classroom at the end of a school day during his eighth-grade year, he had an argument with Rhett Jackson,[64] who "put his hands on" M.G. When M.G. pushed Jackson away, it caused him to fall.[65]  M.G. told Jackson to stop bothering him.  Jackson then came up behind M.G. and began hitting him in the side of the head.[66]  M.G. reported the incident to Riddle.[67]  Jackson was disciplined with an in-school suspension for "hit[ting] another student after class."[68]  M.G. did not contend that there was a racial component to this incident.[69]

---

[62] *Id.*

[63] Doc. no. 38-12 at ECF 44 and doc. no. 38-29 (Darit Riddle Affidavit) ¶ 18(d).  There is also an electronic disciplinary entry relating to DeMartin and dated April 10, 2019, recording the infraction as "other incident," along with the "occurrence note" that "Clayton came by the office and said [M.G.] was trying to start trouble with him during PE.  Clayton said [M.G.] was making comments about his sister.  He said he never made racial comments toward [M.G.]."  Doc. no. 38-25, at ECF 3.  According to the school's records, Riddle issued a warning to DeMartin.  *Id.*

[64] Doc. 38-2 (M.G. Deposition), at 65.

[65] *Id.* at 65.

[66] *Id.* at 66.

[67] *Id.* at 67.

[68] Doc. no. 38-12, at ECF 14.

[69] Plaintiff's brief states that "Rhett Jackson assaulted [M.G.] while calling him racial names."  Doc. no. 44 (Plaintiff's Consolidated Response to Defendants' Motions for Summary Judgment) ¶ 46.  The deposition cites provided by plaintiff do not bear out this contention.  *See* doc. no. 38-2 (M.G. Deposition), at 65-68 & 79.

**K.      Locker Room Incident**

M.G. also testified about the following incident that occurred during his eighth-

grade year:

> A.      I remember one time in the locker room at P.E.  I remember a kid
> — there were multiple kids in there.  I was walking in there to use
> the bathroom during the class while it was going on.
>
> And there was like one or two kids that were calling me the "N
> word."  As I ignored it — and then as I walked out of the
> bathroom they — they were pushing me into lockers calling me
> that.  And I just — I didn't retaliate because that's what I was told
> to do is not retaliate.
>
> Q.      And who told you to not retaliate?
>
> A.      Mr. Riddle.
>
> Q.      Do you know why he told you that?
>
> A.      *He told me that if I was going to stay in trouble at Phil Campbell*,
> that I'm not going to be able to be a part of the basketball team
> anymore.

Doc. no. 38-2 (M.G. Deposition), at 61-62 (emphasis supplied).  M.G. apparently

heeded Riddle's warning, because there is no indication in the record that M.G.

reported the locker room incident to anyone.

**L.      Seth Bullock**

In November of 2018, prior to the school's Thanksgiving break, Seth Bullock

and other students, including Sage Raper, threw basketballs at M.G. during a physical

education class.[70]  As M.G. was walking to the locker room, Bullock said that "he was going to hang [M.G.] like [his] ancestors.  Like how they use to hang African-American people and — like a long time ago."[71]  Bullock also told M.G. that "he was going to run over [him] with a truck."[72]  M.G. learned  that Bullock was talking to other students about what he intended to do to M.G., and showed them pictures of what he had planned, including a picture of a noose.[73]  M.G. related the incidents to his mother, but he did not specify when he did so.[74]

On the Sunday before the students were scheduled to return to school following the Thanksgiving break, rumors were circulating among students and parents that Seth Bullock had threatened to "shoot up the school" on the anniversary of his father's suicide.[75]  Plaintiff was one of the parents who learned of the rumors, and she expressed her concern to Greg Hamilton, the Superintendent of the Franklin County School System.[76]  School administrators notified law enforcement and the following day, when students returned to school, Bullock was searched, interviewed, and

---

[70] Doc. no. 38-2 (M.G. Deposition), at 74-75.

[71] *Id.* at 75 (alterations supplied).

[72] *Id.* at 75-76 (alteration supplied).

[73] *Id.* at 106-07.

[74] *Id.* at 68.

[75] Doc. no. 38-22 (Darit Riddle Deposition), at 167-68.

[76] Doc. no. 38-1 (Brandi Gholston Deposition), at 52-53.

detained.[77]  Law enforcement officials ultimately determined that no charges were

warranted.[78]  Even so, Bullock's mother withdrew her son from Phil Campbell High

School.[79]

Plaintiff testified that she learned about Bullock's threats to M.G. from students

in her English class that day.[80]  She notified Mr. Riddle and other school officials

about the students' reports, and some of the students provided statements to Riddle.[81]

Because Bullock had been withdrawn from school, however, school administrators

did not impose disciplinary sanctions for the alleged threats against M.G.[82]

Nevertheless, there is an entry in the school's electronic disciplinary records relating

to the threat to "shoot up the school," and indicating that Bullock was placed on out-

of-school suspension pending the arrival of law enforcement officers.[83]

Plaintiff individually reported Bullock's threats against her son to law

enforcement, and criminal proceedings were initiated.[84]

---

[77] Doc. no. 38-22 (Darit Riddle Deposition), at 191-93.

[78] *Id.* at 50.

[79] *Id.* at 58.

[80] Doc. no. 38-1 (Brandi Gholston Deposition), at 31-36.

[81] *Id.* at 33-34.

[82] Doc. no. 38-22 (Darit Riddle Deposition), at 49.

[83] *Id.*, Exhibit 4.

[84] Doc. no. 38-1 (Brandi Gholston Deposition), at 51.  The disposition of those proceedings is not contained in the record, but apparently a hearing was held, at which M.G. testified.  Doc. no. 38-3 (Jay Gholston Deposition), at 38.

### M.   Transfer to Russellville High School

Due to "the accumulation of everything" sketched above, plaintiff and her husband transferred their son to Russellville High School at the beginning of his ninth-grade year.[85]

## II.  DISCUSSION

### A.   Title VI

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*., prohibits discrimination based on race, color, or national origin in programs or activities that receive federal financial assistance.[86]  The standard for evaluating student-on-student hostile environment claims is found in the Supreme Court's opinion in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999), holding that "funding recipients" like the Franklin County Board of Education

> are properly held liable in damages only where they are deliberately indifferent to [racial] harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victim[] of access to the educational opportunities or benefits provided by the school.

*Id*. at 650 (alterations supplied).

---

[85] Doc. no. 38-1 (Brandi Gholston Deposition), at 93.  *See also* doc. no. 38-2 (M.G. Deposition), at 90-91.

[86] The Act provides, in pertinent part, that:  "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program, or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.

Even though the *Davis* case arose from a sex-based, student-on-student, hostile environment claim under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.,* the Eleventh Circuit has concluded that *both* Title VI race-based *and* Title IX sex-based hostile environment claims should be evaluated under the "deliberate indifference" standard established by the Supreme Court's opinion in *Davis*, *supra*. *See, e.g., Franklin v. Gwinnett County Public Schools*, 911 F.2d 617, 619 (11th Cir. 1990) ("Hereinafter we discuss Title VI and Title IX cases somewhat interchangeably, because we believe it is settled that analysis of the two statutes is substantially the same."), *rev'd on other grounds,* 503 U.S. 60 (1992); *see also*, *e.g.*, *Fennell v. Marion Independent School District*, 804 F.3d 398, 408 (5th Cir. 2015); *Bryant v. Independent School District Number I-38 of Garvin County*, 334 F.3d 928, 934 (10th Cir. 2013).

The Eleventh Circuit, applying the *Davis* standard in *Williams v. Board of Regents of University System of Georgia*, 477 F.3d 1282 (11th Cir. 2007), also has held that a plaintiff must satisfy the following elements in order to establish a claim for student-on-student hostile environment against a Title VI funding recipient:

> First, the defendant must be a Title [VI funding] recipient.  Second, an "appropriate person" must have actual knowledge of the discrimination or harassment the plaintiff alleges occurred.  "[A]n 'appropriate person' . . . is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination.  Third, a funding

recipient is liable for student-on-student harassment only if "the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities." In considering this element, we analyze the conduct of the funding recipient, not the alleged harasser; we do this to ensure that we hold the funding recipient liable only if the funding recipient's deliberate indifference "subjected the plaintiff to discrimination." Therefore, we will not hold a funding recipient liable solely because a person affiliated with the funding recipient discriminated against or harassed the plaintiff. Fourth, the discrimination must be "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit."

*Id*. at 1293 (alterations supplied and internal citations omitted); *see also Stinson as next friend of K.R. v. Maye*, 824 F. App'x 849, 856-57 (11th Cir. 2020).

### 1. Recipient of federal funds and "appropriate person"

The Franklin County Board of Education does not dispute that it is a recipient of federal funds, or that Darit Riddle is an "appropriate person" for purposes of Title VI. As Assistant Principal of Phil Campbell High School, he was charged with taking corrective action in disciplinary matters.

### 2. Actual notice

Turning to the issue of actual notice of the allegedly racially-hostile incidents, Riddle stated in an affidavit that he could

only remember learning about a handful of incidents allegedly involving use of a racial slur or other racially-motivated conduct, all of which I learned about after-the-fact. Some involved an exchange of insults between students in which both participants bore some responsibility,

and some grew out of basketball-related disputes with teammates. A review of school records confirms that several white students who were involved in confrontational incidents or altercations with [M.G.] were disciplined with suspensions, even when they denied the use of such terminology.

Doc. no. 38-29 (Darit Riddle Affidavit) ¶ 18 (alteration supplied). With that introduction, Mr. Riddle recalled the following incidents:

a.   In November, 2017, [M.G.] and another basketball player, John Randall Herring, got into a verbal altercation on a school bus that involved mutual name calling while returning to PCHS from a charity basketball event. I personally intervened to strongly lecture both students regarding the importance of supporting each other as team members. (The underlying dispute began with finger-pointing over who was responsible for turnovers at the game.) Neither student received formal discipline that instance [*sic*], but my counseling appeared to have the desired effect.

b.   In January, 2018, [M.G.] reported that one of his classmates, Sage Raper (the son of another PCHS teacher and coach), had pushed him after [M.G.] committed a hard foul on Sage during a pickup basketball game in P.E. class. I do not recall [M.G.] making any reference to the use of racial slurs when he reported the incident to me. Nonetheless, I interviewed Sage and attempted to identify any third-party witnesses before viewing surveillance video of the incident with [M.G.] and Ms. Gholston. Ultimately, I administered one day of [in-school suspension] to Sage.

c.   In January 2018, I received a report that members of [M.G.]'s basketball team had played a song called "Alabama N-word" following the team's victory in the county basketball tournament championship game. I spoke with [M.G.] and the coaches present at the game, as well as the players who were accused of playing the song and Ms. Gholston. Each of the accused players denied playing or singing the song or otherwise making any racially

21

insensitive comments toward [M.G.].  While I administered no formal discipline, I have received no subsequent reports that any players continued playing or singing the song.

d.      [M.G.] reported in February, 2018, that another classmate, Clayton DeMartin, had physically "jumped" him in a hallway after class.  I investigated this incident by speaking with Clayton and [M.G.], reviewing any available surveillance video, and attempting to identify any third-party witnesses.  My recollection is that both students acknowledged having exchanged disparaging words, but I do not recall any specific reference having been made to the N-word.  In any case, I administered two days of [in-school suspension] to Clayton as punishment.

e.      At an awards day function in the PCHS gym near the end of the 2017-2018 school year, Ms. Gholston complained that another student, Hunter Bishop, had put chewing gum on [M.G.]'s seat.  Upon receiving the report, I interviewed Hunter.  He denied committing the offense; the proof that he did it was not conclusive, and there was no discernible proof that the prank was motivated by [M.G.]'s race.  I nonetheless punished Hunter with a one day, out-of-school suspension.

*Id.* ¶¶ 18(a)–(e) (alterations supplied).

Riddle also was aware that the reaction of M.G.'s classmates to those portions of the movie "42" containing racial slurs, or those scenes that depicted racially-discriminatory acts, were hurtful to M.G.

Moreover, Riddle acknowledged "two arguably racially motivated incidents involving [M.G.]" during his eighth-grade year:  a physical altercation with Rhett Jackson; and, threatening racial comments by Seth Bullock.

Additionally, Riddle believed that Braxton Lawrence may have used racially derogatory language toward M.G.[87]

Nevertheless, Riddle emphasized that he learned about each of the incidents "after the fact"; and, in some instances, he does not recall M.G. telling him that the student involved used racially derogatory language.  While Riddle did not witness the offensive remarks that were directed toward M.G. during the physical attacks, the testimony of plaintiff and M.G. that they reported the use of such terms to Riddle may show that Riddle had actual notice of the harassing conduct.  *See, e.g., N.K. v. St. Mary's Springs Academy of Fond du Lac Wisconsin, Inc.*, 965 F. Supp. 2d 1025, 1035 (E.D. Wis. 2013) ("Given that, particularly in middle school and high school, students will be aware enough to hide their bigoted language from authority figures," plaintiffs' first-hand reports could demonstrate actual notice.).

### 3.    Severe, pervasive, and objectively offensive conduct

Plaintiff also must show that the race discrimination to which M.G. was subjected, and of which the Board had actual knowledge, was so "severe, pervasive, and objectively offensive" as to effectively deprive M.G. of "equal access to an institution's resources and opportunities."  *Davis*, 526 U.S. at 651; *see also Hill v. Cundiff*, 797 F.3d 948, 972 (11th Cir. 2015).  The Supreme Court recognized that

---

[87] Doc. no. 38-22 (Darit Riddle Deposition), at 42.

students "regularly interact in a manner that would be unacceptable among adults,"

and "often engage in insults, banter, teasing, shoving, pushing, and [race]-specific

conduct that is upsetting to the students subjected to it." *Davis,* 526 U.S. at 651-52

(alteration supplied). "[S]imple acts of teasing and name-calling" are not actionable.

*Id*. at 652. Even so,

> [i]t does not take an educational psychologist to conclude that being
> referred to by one's peers by the most noxious racial epithet in the
> contemporary American lexicon, being shamed and humiliated on the
> basis of one's race, and having the school authorities ignore or reject
> one's complaints would adversely affect a Black child's ability to obtain
> the same benefit from schooling as her white counterparts.

*Monteiro v. Tempe Union High School District*, 158 F.3d 1022, 1034 (9th Cir. 1998).

Indeed, "use of the reviled epithet 'nigger' raises a question of severe harassment

going beyond simple teasing and name-calling." *DiStiso v. Cook*, 691 F.3d 226, 242-

43 (2d Cir. 2012).

The "constellation of surrounding circumstances, expectations, and

relationships" must be considered when assessing whether the complained-of conduct

reaches the level of severe, pervasive, and objectively offensive. *Davis*, 526 U.S. at

651 (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82 (1998)

(Title VII case)). Those considerations include, but are not limited to, "the ages of

the harasser and the victim and the number of individuals involved." *Davis*, 526 U.S.

at 651.

Following *Davis'* lead in looking to the law developed in the context of Title VII hostile-work-environment claims, other considerations that might be taken into account include "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with" the victim's academic experience." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).  *See also*, *e.g.*, *Fennell v. Marion Independent School District*, 804 F.3d 398, 409-10 (5th Cir. 2015) (citing *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000), *abrogated on other grounds*, *Burlington Northern & Santa Fe Railway v. White*, 548 U.S. 53 (2006)).

Here, plaintiff has presented evidence of numerous incidents of racial harassment, several of which involved physical attacks, throughout M.G.'s seventh- and eighth-grade years at Phil Campbell High School.  In addition to the incidents detailed in this opinion, M.G. testified that he was subjected to racial epithets on a daily basis, and added that those incidents were not "the only racial things that happened to me. . . .  Being called the 'N word' was like the minimum thing that happened.  It happened on a daily instance."[88]

The Franklin County Board of Education contends that, even if the racial

---

[88] Doc. no. 38-2 (M.G. Deposition), at 81.

harassment of M.G. is deemed to have been "severe, pervasive, and objectively offensive," plaintiff cannot show that her son was deprived of "equal access to" the "resources and opportunities" available to him at Phil Campbell High School.[89]  The Board argues that M.G.'s outstanding academic and attendance record, as well as the fact that he remained at Phil Campbell High School for the remainder of his eighth-grade year without incident, show that he was not adversely affected by the harassment.  That view of the evidence is too narrow, however, because it does not take into account any mental health effects, which are less capable of quantifying, that the physical attacks and frequent "use of the reviled epithet 'nigger'"[90] may have had upon M.G.

Furthermore, plaintiff responds by arguing that the fact that she and M.G.'s father decided to transfer their son to a different school because of the unaddressed harassment should satisfy this element.  She also contends that M.G. was deprived of "a supportive, scholastic environment free of racism and harassment."[91]  As the Eleventh Circuit observed in *Hawkins v. Sarasota County School Board*, 322 F.3d 1279 (11th Cir. 2003),

---

[89] Doc. no. 37-1 (Franklin County Board of Education Brief in Support of Motion for Summary Judgment), at 20-21.

[90] *DiStiso v. Cook*, 691 F.3d 226, 242-43 (2d Cir. 2012).

[91] Doc. no. 44 (Plaintiff's Consolidated Response to Defendants' Motions for Summary Judgment), at 27 (quoting *Zeno v. Pine Plains Central School District*, 702 F.3d 655, 667 (2d Cir. 2012)).

A demonstration of physical exclusion . . . is not the sole means by which a plaintiff can demonstrate deprivation of an educational opportunity. Rather, a plaintiff need [only] establish that the behavior so undermines and detracts from the victim's educational experience, that the student has effectively been denied access to an institution's resources and opportunities.

The behavior must also be severe enough to have a "systemic" effect of denying the victim equal access to an educational program or activity.  We take this to mean that [race] discrimination must be more widespread than a single instance of one-on-one harassment and that the effects of the harassment touch the whole or entirety of an educational program or activity.

*Id*. at 1289 (alterations supplied, footnote omitted).

Plaintiff testified that it was obvious to her that her son had been adversely affected by the racial harassment he experienced during the seventh and eighth grades at Phil Campbell High School:  "I observed him get quiet, withdrawn, and angry. When I would question him, commonly I would eventually learn about some racial incident at school or on the basketball team."[92]

It is common sense that a middle-school student would be more likely to be harmed by racial insults than an adult faced with the same conduct.  A jury could reasonably conclude from the fact that M.G. and his parents decided that he should transfer to Russellville High School at the beginning of his ninth-grade year because of "the accumulation of everything," combined with plaintiff's reports of her son's

---

[92] Doc. no. 44-2 (Brandi Gholston Declaration) ¶ 4.

behavioral changes, shows that the conduct to which he was subjected, involving multiple incidents and multiple students, satisfies this element.

Accordingly, the court concludes that there is a genuine issue of material fact on the question of whether the racially harassing conduct to which M.G. was subjected was so severe, pervasive, and objectively offensive as to unreasonably interfere with his academic experience.

### 4.    Deliberate indifference

In addition, the court has examined the question of whether the Board of Eduction's action or inaction in response to the known acts of harassment amounted to deliberate indifference. "[F]unding recipients are deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. "A clearly unreasonable response causes students to undergo harassment or makes them more vulnerable to it." *Hill v. Cundiff*, 797 F.3d 948, 973 (11th Cir. 2015) (citing *Williams*, 477 F.3d at 1295-96). "The deliberate indifference standard is rigorous and hard to meet." *Hill*, 797 F.3d at 975.

Here, M.G. and/or his mother reported to Riddle several instances of racial slurs directed toward M.G. Riddle was told by M.G. that a student had called him the "N-word" during music class, but Riddle took no action. When plaintiff related her

concerns about student reaction to the racial language and scenes in the "42" movie shown during M.G.'s enrichment class, Riddle took no action other than requesting that the teacher refrain from showing the movie.

Following the final county basketball tournament game, Riddle learned that M.G. had complained that Boone Swinney had referred to him as a "N-word," and that the "Alabama 'N-word' song" song had been played in the locker room. While Riddle obtained statements from several people, and talked to members of the team about M.G.'s complaint, he ultimately did not address the racially-offensive conduct.

After M.G. reported to Riddle the altercation during his physical education class in which Sage Raper had pushed M.G. into a locker, and called him a "cotton picking 'N-word,'" Riddle only reviewed a surveillance video of the incident with M.G. and his mother, and disciplined Raper for pushing M.G., but did not address the racial slur.

Braxton Lawrence was another student who regularly aimed racial epithets at M.G. Both M.G. and his mother reported Lawrence's abuse to Riddle, but Lawrence was not disciplined.

Clayton DeMartin accosted M.G. and said "F'ing 'N word,' you're going to watch what you say to me." M.G. told Riddle what had happened. Riddle spoke with both students, and DeMartin received a two-day in-school suspension for "hitting

another student," but not for his racist comment.

Lastly, Seth Bullock and other students, including Sage Raper, harassed M.G. during November of 2018, throwing basketballs at him during physical education class. Bullock also made comments to M.G. that he intended to "hang [him] like his ancestors" and run him over with a truck. Riddle learned of this incident a few days after it occurred, in connection with Bullock's threats to "shoot up the school." Riddle took no action with respect to M.G.'s report, ostensibly because Bullock's mother had withdrawn him from school. Even so, he failed to address the other students' involvement.

Given the foregoing, the court concludes that a genuine dispute of material fact exists as to whether the Franklin County Board of Education, acting through an "appropriate person" (*i.e.*, Assistant Principal Darit Riddle), was deliberately indifferent to M.G.'s complaints of racial harassment. Riddle disciplined students who physically abused M.G., but there is scant evidence that he acted on M.G.'s complaints of verbal harassment. In view of the numerous "reviled epithets" that M.G. was frequently forced to endure, a reasonable jury could conclude that Riddle's failure to specifically impose appropriate disciplinary sanctions for incidents of verbal racial slurs was clearly unreasonable. Accordingly, the Board's motion for summary judgment is due to be denied.

**B.     42 U.S.C. § 1983**

Plaintiff contends that Darit Riddle deprived her son of rights protected by the

Fourteenth Amendment of the United States Constitution.  Her claim is based upon

42 U.S.C. § 1983, which provides, in part, that:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the District of
> Columbia, subjects, or causes to be subjected, any citizen of the United
> States or other person within the jurisdiction thereof to the deprivation
> of any rights, privileges, or immunities secured by the Constitution and
> laws, shall be liable to the party injured in an action at law, suit in equity
> or other proper proceeding for redress . . . .[93]

Notwithstanding, whenever a state, county, or municipal official is sued

personally, or in an "individual capacity," under 42 U.S.C. § 1983, the official is

entitled to invoke the so-called "doctrine of qualified immunity" as a defense.  *See,*

*e.g., Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *Busby v. City of Orlando*, 931

F.2d 764, 772 (11th Cir. 1991).  The doctrine protects state governmental officials

whose conduct violated "no clearly established statutory or constitutional rights of

which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800,

---

[93] The origins of this statute lie in the bloodshed of the Civil War and the brief era of "Reconstruction" that followed.  The Reconstruction-era Congress enacted legislation to protect the freedoms granted to those who were recently enslaved.  One such piece of legislation was the Ku Klux Klan Act of 1871, which "targeted the racial violence in the South undertaken by the Klan, and the failure of the states to cope with that violence." *Jamison v. McClendon*, 476 F. Supp. 3d 386, 399 (S.D. Miss. 2020) (citation omitted).  The first section of that Act was codified as the statute quoted in text.

818 (1982); *see also*, *e.g.*, *Thomas ex rel. Thomas v. Roberts*, 261 F.3d 1160, 1170 (11th Cir. 2001) (same); *Lassiter v. Alabama A. & M. University*, 28 F.3d 1146, 1149 (11th Cir. 1994) (*en banc*) (same).[94]

It has been said that doctrine attempts to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The doctrine initially requires that a defendant "prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)).  Plaintiff does not contest this element.  Even so, there are two additional requirements.

The first requires a court to ask whether the facts, viewed "in the light most favorable to the party asserting the injury," show that "the [defendant]'s conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If that question is answered affirmatively, the court will proceed to analyze the second

---

[94] Stated differently, qualified immunity shields state, county, and municipal officials from suit for money damages if a reasonable officer could have believed that his action was lawful, in light of clearly established law and the information possessed by the officer. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).  "Even law enforcement officials who 'reasonably but mistakenly conclude that [their challenged actions were lawful]' are entitled to immunity." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Anderson*, 483 U.S. at 641) (alteration supplied).

aspect of the two-part inquiry:  *i.e.*, "whether the right was clearly established."  *Id.*

Strict adherence to the order of those two inquiries is not required, however.  *See*

*Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("On reconsidering the procedure

required in *Saucier*, we conclude that, while the sequence set forth there is often

appropriate, it should no longer be regarded as mandatory.").  Instead, in appropriate

cases, it is within a district court's discretion to assume that a constitutional violation

occurred in order to address, in the first instance, the question of whether such a

*presumed violation* was "clearly established" on the date of the incident leading to

suit.  *Id.*

Riddle characterizes plaintiff's complaint of unlawful treatment as asserting the

right to be protected from the actions of his fellow students.[95]  He correctly states that

there is no constitutional duty to protect students from third parties.  *See Worthington*

*v. Elmore County Board of Education*, 160 F. App'x 877, 881 (11th Cir. 2005) ("This

Court has previously explained that public schools generally do not have the requisite

level of control over children to give rise to a constitutional duty to protect them from

third-party actors.").  Even so, this court finds that plaintiff's claim is more properly

characterized, as plaintiff states it, as the right to an education free from racially-

discriminatory slurs and actions.  For purposes of the qualified immunity inquiry, the

---

[95] Doc. no. 36-1 (Memorandum Brief in Support of Motion for Summary Judgment by Defendants Greg Hamilton, Gary Odom, and Darit Riddle), at 19-20.

court will assume that a constitutional violation occurred.

When determining whether the unlawfulness of an official's actions was "clearly established," the pertinent question is whether the state of the law on the date of the defendant's alleged misconduct gave the defendant "fair warning" that his "alleged treatment of [the plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (alteration supplied); *see also Williams v. Consolidated City of Jacksonville*, 341 F.3d 1261, 1270 (11th Cir. 2003) (same).

The Supreme Court has rejected the requirement that the facts of previous cases must always be "materially similar" to those facing the plaintiff. *Hope*, 536 U.S. at 739. Instead, in order for a constitutional right to be deemed as having been "clearly established,"

> its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, *see Mitchell* [*v. Forsyth*, 472 U.S. 511,] 535, n. 12, 105 S. Ct. 2806, 86 L. Ed. 2d 411; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

*Hope*, 536 U.S. at 741 (alteration in original). Even so, the Supreme Court has

> reiterate[d] the longstanding principle that "clearly established law" should not be defined "at a high level of generality." As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. Otherwise, "[p]laintiffs would

34

be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."

*White v. Pauly*, ___ U.S. ___, 137 S. Ct. 548, 552 (2017) (first alteration supplied, second alteration in original, citations omitted).

An official can receive "fair warning" of his or her unlawful conduct in various ways.

First, the plaintiffs may show that a materially similar case has already been decided.  Second, the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation. Finally, the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary.  Under controlling law, the plaintiffs must carry their burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the [Alabama] Supreme Court.

*Terrell v. Smith,* 668 F.3d 1244, 1255-56 (11th Cir. 2012) (citations and quotation marks omitted, alteration supplied).  *See also Vinyard v. Wilson*, 311 F.3d 1340, 1350-52 (11th Cir. 2002) (same); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.").  "The second and third methods are generally known as 'obvious clarity' cases. . . . Cases do not often arise under the second and third methods."  *Gaines v. Wardynski*, 871 F.3d 1203, 1209 (11th Cir. 2017) (collecting cases).  Courts "very occasionally encounter the exceptional case

in which a [defendant's] acts are so egregious that preexisting, fact-specific precedent was not necessary to give clear warning to every reasonable . . . [defendant] that what the [defendant] was doing must be [unlawful]." *Rodriguez v. Farrell*, 280 F.3d 1341, 1350 n.18 (11th Cir. 2002) (alterations supplied).

Taking the third method first, the court cannot find that Riddle's conduct in this case was so egregious as to violate the Fourteenth Amendment on its face. There is no evidence that Riddle took appropriate disciplinary action to stem the flow of racial slurs aimed at M.G., but his conduct did not rise to the level of "egregiousness." Likewise, under the second method, plaintiff's statement of the constitutional right at issue — the right to an education free from free from racially-discriminatory slurs and actions — is overly broad, and violates the Supreme Court's admonition in *White* that "clearly established law" should not be defined "at a high level of generality." "A reasonable official's awareness of the existence of an abstract right . . . does not equate to knowledge that *his* conduct infringes the right." *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997).

That leaves the court with the primary method for determining whether a defendant is entitled to qualified immunity under clearly established law: *i.e.*, whether there is a materially similar case that had been decided prior to the dates of the relevant incidents.

The parties agree that neither the Supreme Court nor Eleventh Circuit have rendered opinions addressing the contours of student-on-student racial harassment. Nevertheless, plaintiff points to several cases in an attempt to persuade this court that M.G.'s constitutional rights were clearly established.

First, plaintiff cites the seminal case of *Brown v. Board of Education*, 347 U.S. 483 (1954). While that case established that state laws requiring racial *segregation* of students in public schools are unconstitutional, it is out of place here.

Plaintiff also cites *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005). That case also is inappropriate, because it addressed a claim of *retaliation* against a high-school girls' basketball coach for complaining that his team did not receive equal funding and equal access to athletic equipment and facilities under Title IX of the Education Amendments Act of 1972. The case has no bearing on plaintiff's contention that Riddle is not entitled to qualified immunity.

Next, plaintiff points to *Watkins v. Bowden*, 105 F.3d 1344 (11th Cir. 1997), which arose under 42 U.S.C. § 1983 in the employment context. Apart from stating that "claims under the Equal Protection Clause based on sexual and racial harassment claim [*sic*] have long been recognized,"[96] plaintiff fails to show how that opinion would have given defendant Riddle fair warning of a constitutional violation in the

---

[96] Doc. no. 44 (Plaintiff's Consolidated Response to Defendants' Motions for Summary Judgment), at 29.

context of this case.

Finally, plaintiff invokes *Hill v. Cundiff*, 797 F.3d 948 (11th Cir. 2015), as support for the claim that clearly established law gave Riddle fair warning that his actions (or inactions) were unconstitutional.  In that case, a female eighth-grade student (referred to in the court's opinion as "Jane Doe") was raped in a school bathroom by another student.  *Id*. at 956.  She had previously complained to school officials about the perpetrator's sexual advances toward her, and other students had complained about his behavior as well.  *Id*. at 961.  Moreover, during the eighteen-month period preceding the rape, the perpetrator had been disciplined five times for sexual misconduct, and four times for fighting or threatening behavior.  *Id*. at 959.  On the day of the rape, Jane Doe was propositioned by the perpetrator as she was reporting to gym class.  *Id*. at 961.  She did not respond to him, but told a teacher's aide what he had said.  *Id*.  The teacher's aide asked Doe whether she wanted to get the student in trouble and she replied that she did.  *Hill*, 797 F.3d at 961.  The teacher's aide told Doe that she would have to go meet him and set him up, so that he would be caught.  *Id*.  Doe initially expressed reluctance to execute this plan, but eventually told the teacher's aide that she would participate.  *Id*.  The teacher's aide then escorted Doe to the assistant principal's office and, according to the teacher's aide, told the assistant principal of the plan to use Doe as "bait."  *Id*. at 962.  In

accordance with instructions by the teacher's aide, Doe told the perpetrator that she would have sex with him, and he responded by telling her to meet him in the boys' bathroom. *Id*. She did so, and tried to stall him, believing that a teacher would arrive. *Id*. That did not happen, however, and Doe was subjected to anal rape. *Hill*, 797 F.3d at 963. Teachers entered the bathroom after the assault and removed both students. *Id*. An investigation of the incident ensued, but the principal took no action to reform the high school's sexual harassment or recordkeeping policies in response to the rape. *Id*. at 965. The Eleventh Circuit held that no reasonable official in the principal's position could believe that doing nothing was lawful. *Id*. at 979.

Likewise, the Circuit held that the participation by the assistant principal and teacher's aide in the plot to entrap the perpetrator was egregious, and reversed the district court's grant of summary judgment, stating: "It is not surprising the district court could not find similar case law," because every reasonable official would know the scheme violated the Equal Protection Clause. *Hill*, 797 F.3d at 979.

Plaintiff has not demonstrated that *Hill* is "materially similar" to this case. As defendant Riddle points out, the teacher's aide and assistant principal in that case personally participated in the plan to apprehend the perpetrator, which is distinguishable from Riddle's conduct here. The *Hill* principal's failure to take corrective action to reform the school's sexual harassment and disciplinary

39

recordkeeping policies are somewhat similar to Riddle's inaction in response to the racist slurs inflicted upon M.G., but the court cannot find that his administrative deficiencies were clearly unreasonable, unlike in *Hill*, such that he should be denied qualified immunity. Accordingly, Riddle's  motion for summary judgment is due to be granted.

### III.  CONCLUSION

For all of the foregoing reasons, it is ORDERED that the motion for summary judgment filed by the Franklin County Board of Education be, and the same hereby is, DENIED.  It is further CONSIDERED, ORDERED, and ADJUDGED that the motion for summary judgment filed by defendant Darit Riddle with respect to plaintiff's 42 U.S.C. § 1983 claim asserted against him is due to be, and the same hereby is, GRANTED, and that claim is dismissed on the basis of the doctrine of qualified immunity.

Finally, in accordance with plaintiff's admission that all claims, other than her Title VI claim against the Franklin County Board of Education and her 42 U.S.C.§ 1983 claim against Darit Riddle are due to be dismissed,[97] it is CONSIDERED, ORDERED, and ADJUDGED that all other claims be, and the same hereby are, DISMISSED with prejudice.  Costs are taxed to the party who incurred them.

---

[97] *See* doc. no. 44 (Plaintiff's Consolidated Response to Defendants' Motions for Summary Judgment), at ECF 6.

**DONE** and **ORDERED** this 17th day of November, 2021.

_____
Senior United States District Judge

41